Filed 8/16/21  In re S.C. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Modoc)

----

| | |
|---|---|
| In re S.C., a Person Coming Under the Juvenile Court Law. | C090146 |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>S.C.,<br><br>    Defendant and Appellant. | (Super. Ct. No. JL18023) |

Teenaged S.C. was alleged to have sexually assaulted S.M., the minor victim, on multiple occasions over the course of several months.  The juvenile court sustained a juvenile wardship petition under Welfare and Institutions Code section 602 after finding true counts alleging forcible oral copulation of a child, sexual penetration of a person under the age of 14, and sodomy of a person under the age of 14.  The juvenile court

1

adjudged S.C. a ward of the court, committed him to Shasta County Juvenile Hall, and further committed him to county jail upon turning 18. S.C.'s maximum period of confinement was set at 18 years 11 months and 22 days.

On appeal, defendant contends it was error to admit S.M.'s forensic interview and her statements to a therapist because by declining to answer any relevant questions at trial she failed to "testify" as required by Evidence Code section 1360. He argues this complete failure to respond to questions regarding her (previously made) accusations denied him his right to confrontation. Defendant also contends the forensic interview and S.M.'s statements to the therapist were not admissible under Evidence Code section 1228, that insufficient evidence supports the forcible oral copulation count, and that the court erred in ordering him committed to county jail when he turned 18, incorrectly set his maximum period of confinement, and failed to properly calculate his custody credits.

We find merit in S.C.'s first contention. Because S.M. refused to answer *any* questions at trial relating to her claims against S.C., she did not "testify" as required by Evidence Code section 1360. Consequently, it was error to admit her forensic interview and her statements to the therapist. Admitting this evidence denied S.C. his constitutional right to confrontation; he was not able to cross-examine S.C. about the damaging allegations she made against him to others but refused to discuss on the stand.

Because admitting the forensic interview and testimony from the therapist prejudiced S.C., we shall reverse. We do not reach the remainder of S.C.'s claims.

FACTUAL AND PROCEDURAL BACKGROUND

In July 2018, the Modoc County District Attorney filed a juvenile wardship petition that alleged between November 1, 2017, and June 29, 2018, S.C. committed the following sexual offenses against S.M.

2

Kidnapping of a child under the age of 14 to commit oral copulation (Pen. Code, § 209, subd. (b)—count one),[1] sodomy upon a child under the age of 14 and seven or more years younger than the minor (§ 269, subd. (a)(3)—count two), oral copulation of a child under the age of 14 and seven or more years younger than the minor (§ 269, subd. (a)(4)—counts three & four), sexual penetration of a child under 14 and seven or more years younger than the minor (§ 269, subd. (a)(5)—count five), continuous sexual abuse of a child under the age of 14 (§ 288.5, subd. (a)—count six), forcible oral copulation upon a person under the age of 14 (§ 288a, subd. (c)(2)(B)—count seven), sexual penetration with a person under the age of 14 and more than 10 years younger than the minor (§ 289, subd. (j)—count eight), and sodomy with a person under the age of 14 and more than 10 years younger than the minor (§ 286, subd. (c)(1)—count nine). S.C. was arrested in August 2018 and subsequently detained at juvenile hall.[2]

The court denied the prosecutor's motion to transfer S.C. to adult criminal court after finding him fit for juvenile court jurisdiction. The following evidence was adduced at a contested jurisdictional hearing in August 2018.

In November 2017, Christine R. and her minor daughter S.M., moved into a trailer park in Cedarville. S.M. turned five years old the next month.

Fifteen-year-old S.C. lived in the same trailer park with his mother, stepfather, and three younger brothers, J., V., and I. S.C.'s trailer was red and was located one spot away

---

**1**    Undesignated statutory references are to the Penal Code.

**2**    Deputy Dominick Middleton arrested S.C. at school and transported him to the police station for questioning. Although he initially denied any wrongdoing, after Deputy Middleton told S.C. he did not believe him and falsely said that a medical examination of S.M. had revealed that "terrible things" had been done to her body, S.C. eventually stated that everything S.M. said happened. The court later granted defense counsel's motion to strike Deputy Middleton's testimony regarding S.C.'s confession, finding that the confession was not voluntary, and the court did not consider it.

3

from S.M.'s trailer. His stepfather worked as the maintenance man at the trailer park, and his mother owned a restaurant where S.C. sometimes worked after school and on weekends.

S.M. would often play with V. and I. around the trailer park. But according to Christine, S.M. was not allowed to go inside their trailer unless she gave S.M. permission and both their parents were home. With the exception of one time around June 2018, when she saw S.M. and S.C. emerge from S.C.'s family trailer after she called for her, she was not aware of S.M. visiting the trailer without her permission.

In January or February 2018, S.C.'s mother began giving S.M. rides to preschool because her younger boys also attended the same school. Christine testified that around that time, S.M. began having anger problems at school, wetting the bed again although she was previously night potty trained, and complained of rectal discomfort; she also began taking several baths a day because she said she felt dirty.

The neighborhood kids would sometimes play at a school located across the street from the trailer park. On June 19, 2018, S.M. came back from the school playground in tears and told her mother that Joel, a 10-year-old boy who lived in the trailer between her and S.C., said she could not play with the kids unless she had sex with S.C.[3] Christine called the sheriff's department to report the comment, but she was told there was nothing they could do about it. At the jurisdictional hearing, Joel denied making the statement to S.M.

A few weeks later, on June 29, 2018, Christine had several children over at her home to play. One of her grandchildren who was present told her that Joel was outside talking about S.M. having sex. According to Christine, she questioned Joel and he said that he had walked in on S.M. having sex with somebody. Joel, however, testified that

---

**3** Joel's family moved into the trailer park on June 2, 2018.

S.M. had told him she had been touched, but she never disclosed who touched her or where she had been touched. He said he never told her mom what S.M. had said, and Christine never asked him about what S.M. had told him.

When Christine asked S.M. about what her grandson had said, S.M. stated that things had happened, although she did not tell Christine everything that happened. Christine then called the sheriff's department to report that S.M. had been molested.

S.M. testified at the jurisdictional hearing via closed circuit television. At the time, she was six years old and going into the first grade. She initially testified that she did not know if she could tell the prosecutor who S.C. was, but then acknowledged that he used to live near her. She did not remember the color of his house. S.M. said she remembered talking to a lady a long time ago about what S.C. did to her.[4] When asked what S.C. did, S.M. said she did not want to tell.

The prosecutor asked S.M. multiple times to explain what S.C. had done, but she repeatedly responded she did not want to tell. The prosecutor then asked S.M. what she called her private parts where she goes potty. S.M. responded that she did not know what to say.

When asked whether anything had ever happened at S.C.'s house, S.M. said, "yeah . . . what he did to me." But S.M. refused to elaborate when asked what S.C. did to her. She said she had been with S.C. at a playground across the street from the trailer park where they lived, and that something happened at the playground. When asked what happened, S.M. responded, "the same thing." The prosecutor asked whether S.M. could tell her "a little bit about what that is," and S.M. replied, "no." When questioned why, S.M. said, "[b]ecause I don't want to." The prosecutor then said that she had heard someone may have touched S.M.'s private parts, and asked S.M. to tell the court about

---

**4**     S.M. participated in a sexual assault forensic interview in July 2018.

5

that. S.M. responded, "[h]um-um." In light of S.M.'s responses, the prosecutor had no more questions and defense counsel did not ask S.M. any questions.

After S.M. was dismissed as a witness, the prosecutor sought to introduce S.M.'s July 12, 2018 forensic interview with Erica Tassone from the office of Social Services. Over defense counsel's objection, the video recorded forensic interview was admitted into evidence and played for the court.

During the forensic interview, S.M. said that S.C. was a bully that did something bad to her. S.C. was 15 years old at the time. S.C. told her his name at a red house. S.C.'s brothers, V. and I., who were three and five, also lived at the house. S.C. also had another brother, J.

When she was four, S.M. said S.C. "stuck his wiener in [her] butt" on a couch in the red house when no one else was home. She undressed, S.C. kissed her, and then she had to suck his "wiener." He then stuck his "wiener up [her] butt." S.C. also "stuck his finger up where [her] babies come out," and she "cried." She explained that her babies come out from "the hole that's in [her] vagina." He told her not to tell anyone, including her mother. S.C. did not say anything would happen to her if she told.

S.M. said that S.C. asked her to go to the big kid school with him, which was across the street from the trailer park where they lived; he was nice and let her hold his hand as they walked to the school. Once there, he said they should have sex behind a garage on the campus, and he made her suck his wiener. According to S.M., she choked because S.C.'s wiener was "huge"; S.C. also had "hair on his wiener." It also "tasted like pee." S.C. did it "a whole bunch of times" at the school. One time, S.C.'s brother J. saw them and made her "suck his wiener" at the school as well. J.'s wiener was small and did not have any hair on it.

S.M. said it "hurt so much" when S.C. "stuck his wiener in [her] butt," and that she cried. One time Joel (her next-door neighbor) discovered them in S.C.'s bedroom in the red house; S.M. was naked and pulling on her "chonies" (underwear). S.C. told Joel

6

that he was going to have sex with S.M. S.M. got dressed and they went into the kitchen. Joel asked them to do it again, but they only laid on top of each other.

During the forensic interview, S.M. also said her five-year-old friend Declan did the same thing to her as S.C. He made her "suck his wiener," "his things that are right there," and "his boobs too." She said it happened in the bathroom of her house. S.M. explained that Declan sat on her face and made her suck his butt. She said they "had sex together" and that his "wiener was very small." She told him they should do it, although she did not think it was right.

S.M. said that Declan stuck his "wiener up her butt" three times. The last time they did it under her mother's blanket, and her mom was home at the time. She said her mom was in the living room, and her and Declan were in the bathroom. S.M. said Joel saw what happened with Declan. Joel walked around her house, knocked on the door, and saw she and Declan in the bathroom even though the door was closed because he had "super eyes."

Over defense counsel's objection, the court also permitted Ann Holding, a marriage and family therapist at Modoc County Behavioral Health who assessed S.M. on October 3, 2018, to testify that during a therapy session S.M. said that S.C. had put his penis in her mouth and it hurt. S.M. said that it happened more than one time. She also mentioned that another boy at the playground wanted her to do the same thing.

A juvenile hall probation officer testified that when S.C. was first detained, he told the officer that he was there because he "molested" or "touched" a girl to whom his mother gave rides. The officer could not remember S.C.'s precise words, however.

Teresa M., S.C.'s mother, testified that he had learning disabilities and was immature. From October 2017 through March 2018, S.C. worked at her restaurant after school and on weekends, although Teresa later admitted that she closed her restaurant on Sundays. She never left S.C. by himself because he had started several fires.

7

In January, Teresa offered to give S.M. a ride to preschool. S.M. would come into her house before school, and she would sit on their couch in the kitchen. In March, S.M. came over wanting to play with V. and I.; she threw a tantrum, went outside, and threw a rock through Teresa's trailer window. After S.M. broke the window, she was no longer welcome to play with Teresa's children at the trailer. To Teresa's knowledge, S.M. had not been in her trailer since that day. Because their trailer was small and only had one bathroom, Teresa would sometimes see her children naked. She testified that S.C. did not have any pubic hair before he was taken into custody. She admitted that S.C. had gotten in trouble in May 2016 for being sexually disrespectful to girls in his class, but claimed he hung out with the wrong crowd and they had dared him.

After acknowledging that S.M. had essentially refused to testify regarding the specific details of the alleged crimes, the court nevertheless relied on S.M.'s forensic interview as well as her statements to Holding during therapy to find true the allegations in count four (§ 269, subd. (a)(4), oral copulation of a child), count eight (§ 289, subd. (j), sexual penetration of one under 14 years and more than 10 years younger), and count nine (§ 286, subd. (c)(1), sodomy of one under 14 years and more than 10 years younger). The court declined to find the remaining allegations true beyond a reasonable doubt.

At a disposition hearing on August 19, 2019, the juvenile court adjudged S.C. a ward of the court under Welfare and Institutions Code section 602 and committed him "to Shasta County Juvenile Hall or other such facility that [is] appropriate. And if he turns 18, county jail for a period not to exceed the maximum confinement time, 18 years, 11 months, and 22 days to life."[5] S.C. appealed before the juvenile court entered the disposition order.

---

[5] The written order and judgment of wardship and commitment provides in relevant part: ". . . [S.C.] is committed to Shasta County Juvenile Hall or other juvenile hall facility, or if over the age of eighteen, a county jail facility, for a period not to exceed the

8

## DISCUSSION

### I

### *Premature Notice of Appeal*

A minor may appeal a judgment in a Welfare and Institutions Code section 602 proceeding "in the same manner as any final judgment." (Welf. & Inst. Code, § 800, subd. (a).) "A dispositional order is appealable, and review on appeal encompasses the court's jurisdictional findings." (*In re G.C.* (2020) 8 Cal.5th 1119, 1126.)

S.C. filed his notice of appeal prematurely after the juvenile court sustained three counts of the petition at the jurisdictional hearing, but before the juvenile court entered its dispositional order. Despite its premature filing, both parties urge us to treat the notice of appeal as being filed immediately after the disposition hearing as permitted by rule 8.406(d) of the California Rules of Court.[6] We agree, and shall treat S.C.'s appeal as timely filed.

### II

### *Evidence Code Section 1360 and Defendant's Constitutional Right to Confrontation*

Defendant contends the court erred in admitting S.M.'s hearsay statements made during her July 2018 forensic interview and her hearsay statements to Holding during therapy under the hearsay exception in Evidence Code section 1360, because she did not testify in any meaningful way at the adjudication hearing and was not unavailable as a witness. Admitting the hearsay statements, he argues, violated his constitutional right to confrontation.

---

maximum confinement time of Eighteen (18) Years, Eleven (11) Months, and Twenty-two (22) Days to Life . . . ." (Emphasis removed.)

[6] Rule 8.406(d) provides: "A notice of appeal is premature if filed before the judgment is rendered or the order is made, but the reviewing court may treat the notice as filed immediately after the rendition of judgment or the making of the order."

A.      *Forfeiture*

Before considering the merits of defendant's arguments, we address the People's contention that defendant forfeited his claim because his counsel failed to object under Evidence Code section 1360, instead asserting that the forensic interview and Holding's testimony were inadmissible under Welfare and Institutions Code section 625.6 and Evidence Code section 1228.  Generally, trial counsel must object to claimed evidentiary error on the same ground asserted on appeal; the failure to do so results in forfeiture. (*People v. Dykes* (2009) 46 Cal.4th 731, 756.)  After examining the record here, we are satisfied that defendant sufficiently preserved his claim for review.

While it is true that defense counsel cited Welfare and Institutions Code section 625.6 and Evidence Code section 1228 in arguing the evidence was inadmissible, after the prosecutor noted that she sought to introduce the evidence under Evidence Code section 1360, defense counsel argued that, for at least some of the claims, Evidence Code section 1360 did not apply.  The trial court, however, disagreed and found the evidence admissible under Evidence Code section 1360.  The applicability of Evidence Code section 1360 was thus squarely before the court.  Defense counsel, moreover, also objected that defendant had been denied his constitutional right to confrontation.  Given the above, whether the evidence was properly admitted under Evidence Code section 1360 or violated defendant's confrontation rights was adequately presented below.

B.      *Admissibility of S.M.'s Out-of-Court Statements During Investigation*

Having concluded defendant sufficiently preserved his appellate challenges, we turn to the merits of his claim that admitting S.M.'s forensic interview and her statements to Holding violated Evidence Code section 1360 and his constitutional right to confrontation.  We agree.

Evidence Code section 1360 provides in part:

"(a) In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed

10

with or on the child by another, or describing any attempted act of child abuse or neglect with or on the child by another, is not made inadmissible by the hearsay rule if all of the following apply:

"(1) The statement is not otherwise admissible by statute or court rule.

"(2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability.

"(3) The child either:

"(A) Testifies at the proceedings.

"(B) Is unavailable as a witness, in which case the statement may be admitted only if there is evidence of the child abuse or neglect that corroborates the statement made by the child.

"(b) A statement may not be admitted under this section unless the proponent of the statement makes known to the adverse party the intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings in order to provide the adverse party with a fair opportunity to prepare to meet the statement."

In *Crawford v. Washington* (2004) 541 U.S. 36, 47-59 [158 L.Ed.2d 177] (*Crawford*), the United States Supreme Court announced the new rule that the admission of "testimonial" hearsay statements against a criminal defendant violates the confrontation clause of the Sixth Amendment if the declarant is unavailable to testify at trial and the defendant had no previous opportunity to cross-examine. *Crawford* applies to testimonial statements admitted under Evidence Code section 1360. (*People v. Sisavath* (2004) 118 Cal.App.4th 1396, 1398 (*Sisavath*).)

In *Sisavath*, the appellate court found a forensic interview was testimonial because it was held after the information was filed, a deputy district attorney and an investigator were present, and it was conducted by a specialist. (*Sisavath, supra*, 118 Cal.App.4th at pp. 1402-1403.) Here, the forensic interview was conducted after S.M.'s mother reported

11

to law enforcement that S.C. had molested S.M. As part of his investigation, Officer Middleton arranged the interview with a specialist, and the officer, a social worker, and an attorney observed the interview from a closed circuit camera. Following the forensic interview, Officer Middleton requested a warrant for defendant's arrest. S.M.'s interview with Holding occurred several months after defendant's arrest, and after the wardship petition had been filed.

Given the ongoing investigation of defendant and S.M.'s young age, there is no serious doubt that S.M.'s statements were made under circumstances that would lead an objective witness reasonably to believe that the statements would be available for use at a later trial. (*Sisavath, supra*, 118 Cal.App.4th at p. 1402.) Thus, under *Crawford* and Evidence Code section 1360, S.M. was required to testify or have been available earlier for cross-examination in order to admit the forensic interview or her statement to Holding. Absent those safeguards, admitting the forensic interview and her statements to Holding violated the right to confrontation. (*Sisavath*, at pp. 1398, 1401.)

Defendant contends S.M.'s limited responses to some questions at trial do not qualify as "testifying" under Evidence Code section 1360 because she refused to discuss anything related to the alleged molestation, including the accusations she had made to others. He notes the court recognized that "in terms of testifying with regard to the specifics of the elements of the allegations, she essentially refused to testify." Likewise, the prosecutor conceded during closing argument that S.M. "would not tell us about her views in court . . . and even though we let her testify via closed-circuit, she still shut down and wouldn't talk to us."

We have described S.M.'s testimony in detail *ante*. As the prosecutor's questioning continued, it became apparent that S.M. was refusing to answer any questions related to what S.C. had allegedly done to her. When the prosecutor asked S.M. about what supposedly happened at S.C.'s house or at the playground across the street, S.M. repeatedly said she did not want to tell, and refused to answer. She

responded, "hum-um," when asked to tell the court about if someone may have touched her private parts. Given S.M.'s refusal to discuss the allegations in any manner whatsoever with the prosecutor, it became clear that further questioning would garner more of the same, and defense counsel did not ask any questions before S.M. was excused.

Because S.M. took the stand and answered some questions about her name and where she lived, the trial court admitted the forensic interview where S.M. spoke extensively about the alleged molestation, as well as the statement she made to Holding implicating defendant. The People relied on the interview and S.M.'s out-of-court statements to prove defendant's guilt. Because S.M. refused to discuss the allegations and her prior statements about them on the stand, defendant had no real opportunity to cross-examine her as to the most significant evidence against him. (*People v. Cole* (2004) 33 Cal.4th 1158, 1201 ["A defendant will be excused from the requirement of making a timely objection and/or a request for admonition if either would have been futile"].)

The People contend there was no violation of Evidence Code section 1360 and the right to confrontation because S.M. did not refuse to testify, but rather simply refused selectively to answer some questions about what S.C. had done to her. They note that " '[t]he Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." ' " (*United States v. Owens* (1998) 484 U.S. 554, 559 [98 L.Ed.2d 951]; see also *People v. Carter* (2005) 36 Cal.4th 1114, 1172 ["[T]he federal Constitution guarantees an opportunity for effective cross-examination, not a cross-examination that is as effective as a defendant might prefer"].) We are not persuaded.

In *People v. Homick* (2012) 55 Cal.4th 816 at page 855, a witness for the prosecution was impeached with prior inconsistent statements after he claimed his previous statements were coerced by the police, asserted a lack of memory, refused to

13

answer questions "and generally behaved in an uncooperative and childish manner." On appeal, the defendant asserted the witness's refusal to answer questions on cross-examination violated his confrontation rights. (*Id.* at p. 861.) Our Supreme Court disagreed. "While his refusal to answer defendant's counsel's questions 'narrowed the practical scope of cross-examination, [his] presence at trial as a testifying witness gave the jury the opportunity to assess [his] demeanor and whether any credibility should be given to [his] testimony or [his] prior statements. This was all the constitutional right to confrontation required.' " (*Ibid.*)

There is, however, a significant difference between an adult witness who refuses to answer questions and a child witness who does the same. As explained in *People v. Giron-Chamul* (2016) 245 Cal.App.4th 932 at page 967: "An adult witness's difficult and defiant conduct, such as refusing to answer questions, gives rise to an inference that the testimony the witness does give is not believable." But "[a] similar inference does not arise when a child witness has difficulty answering questions. Indeed, a child's reluctance to answer questions, especially about sensitive subjects such as molestation, may *enhance* the child's credibility to the extent it suggests that whatever happened is too traumatic for the child to discuss."

Here, S.M.'s refusal to answer questions about the alleged molestation because she did "not want to tell" strongly suggested that S.C. had done something traumatic to her. Due to her refusal, the prosecutor was unable to elicit any response at all regarding what he had supposedly done, however. And her steadfast refusal to answer questions about the allegations essentially rendered any attempt at cross-examination futile. Defendant was thus denied a "full and fair opportunity to probe and expose" the infirmities in S.M.'s prior accusations against him. (*United States v. Owens, supra*, 484 U.S. at p. 558.) Because S.M. refused to answer any questions about the allegations against S.C., her limited responses while on the witness stand cannot be considered testimony as required by Evidence Code section 1360.

14

Nor was S.M. "unavailable" within the meaning of the statute. For purposes of Evidence Code section 1360, a child is "unavailable" as a witness if the child is (1) exempted or precluded by privilege from testifying about a matter to which her statement is relevant; (2) disqualified from testifying on the matter; (3) dead or unable to attend or testify due to a then-existing physical or mental infirmity or illness; (4) absent from the hearing and the court cannot compel her attendance; (5) absent from the hearing and the proponent of her statement has exercised reasonable diligence but has been unable to procure her attendance by the court's process; or (6) persistent in refusing to testify concerning the subject matter of the out-of-court statement despite having been found in contempt for refusing to testify. (Evid. Code, § 240, subd. (a).) Nothing in the record establishes that any of the above-mentioned criteria apply. Thus, S.M. was not "unavailable" within the meaning of the statute, and we do not address the parties' arguments regarding whether evidence existed to corroborate S.M.'s statements.

Because S.M. failed to satisfy the requisites of Evidence Code section 1360, the trial court erred in admitting her forensic interview and her statements to Holding.

C.      *Prejudice*

Violations of the right to confrontation are subject to federal harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705]. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681 [89 L.Ed.2d 674].) "Since *Chapman*, we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." (*Ibid.*)

The forensic interview and S.M.'s statement to Holding provided the strongest evidence by far that S.C. sexually abused S.M. The video of the forensic interview was the only time the court saw S.M. herself make any specific claims against S.C. And she provided details not otherwise heard about defendant sticking his wiener in her butt and down her throat on multiple occasions.

This was by far the most powerful evidence of the alleged sexual offenses introduced against defendant. As the juvenile court stated, it "boil[ed] down to the credibility and reliability that I give to [S.M.'s] forensic interview, really." The court believed "something happened" that was sexually inappropriate between S.M. and S.C. The court noted that, as the trier of fact, it "would have loved to have had this statement vetted with some cross[-]examination, or at least some follow-up evidence with regard to things that are apparent inconsistencies here that law enforcement could have easily documented, and followed up on, and verified, and corroborated." Nevertheless, it found S.M.'s forensic interview basically credible, although it believed she had blended some instances together.

Admitting S.M.'s statements during the forensic interview and to Holding was error. Given the juvenile court's reliance on such evidence, we cannot say with confidence that the error was harmless beyond a reasonable doubt. Counts four, eight, and nine must be reversed.[7]

---

[7] S.C.'s statement to a probation officer that he either had "molested" or "touched" a girl, as the probation officer could not recall his precise words, is insufficient to support the true findings on the petition. The statement, whatever it may have been, did not encompass the elements necessary to sustain the petition allegations for any of the charged offenses.

## DISPOSITION

Count four, oral copulation of a child under the age of 14 and seven or more years younger than the minor (§ 269, subd. (a)(4)), count eight, sexual penetration with a person under the age of 14 and more than 10 years younger than the minor (§ 289, subd. (j)), and count nine, sodomy with a person under the age of 14 and more than 10 years younger than the minor (§ 286, subd. (c)(1)) are reversed.

_____/s/_____
BLEASE, J.

We concur:

_____/s/_____
RAYE, P. J.

_____/s/_____
ROBIE, J.